1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

SALLY CORTEZ,

              Plaintiff,

   v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

             Defendant.
_____/

CASE NO. 1:11-cv-00474-LJO-SMS

FINDINGS AND RECOMMENDATIONS
RECOMMENDING THAT THE COURT
AFFIRM DENIAL OF BENEFITS AND
ORDER JUDGMENT FOR COMMISSIONER

     Plaintiff Sally Cortez, by her attorneys, Law Offices of Jeffrey Milam, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act and for supplemental security income  ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.  Following a review of the complete record and applicable law, the undersigned recommends that the Court affirm the Commissioner's denial of benefits.

## I.   Administrative Record

### A.   Procedural History

     Plaintiff was insured under the Act through December 31, 2011.  On December 12, 2006, Plaintiff applied for disability insurance benefits pursuant to Title II and supplemental security income ("SSI") under Title XVI, claiming chronic liver disease and affective (mood) disorder.

Plaintiff alleged disability beginning June 13, 2006.  Her claims were initially denied on May 9, 2007, and upon reconsideration, on January 24, 2008.  On December 1, 2007, Plaintiff filed a timely request for a hearing.  Plaintiff appeared and testified at a hearing on March 9, 2008.  On September 30, 2009, Administrative Law Judge Sharon L. Madsen denied Plaintiff's applications.  The Appeals Council denied review on January 19, 2011.  On March 18, 2011, Plaintiff filed a complaint seeking this Court's review.

### B.     Factual Record

At the time of the hearing, Plaintiff (born November 18, 1967) lived with her long-time boyfriend and two of her five children.  She was able to take care of her personal needs.  She did some household chores, including washing dishes and making her bed, but did not shop or do laundry.  On a typical day, she watched television, read the newspaper, and slept.  Plaintiff testified that her medications made her sleepy and that she often dozed off while resting on her bed or sitting in a recliner.  Although her doctors attempted to adjust the dosages, they told her that no alternative medications were available that would not make her drowsy.

Plaintiff testified that she completed school through the eleventh grade.  Although Plaintiff had a driver's license, she drove infrequently.  Plaintiff had a prior felony conviction and was in custody from 1986 to 1996.  Plaintiff had a history of drug use but had been clean and sober since 1996.

Plaintiff had previously worked doing dry cleaning, pressing and hanging the clothes.  She had also worked for five months in a factory loading tortillas into crates.  While doing that work, which required her to lift 30 to 40 pounds, Plaintiff first began to experience back problems, but she did not seek treatment at that time.  She testified that she now had constant back pain and neck spasms, which were being treated with medication.  The range of motion of her neck was limited.

According to Plaintiff, her diabetes medication had recently been increased because her blood sugar, which she tested daily, was running about 160 to 170.  She had developed numbness in her hands and feet, which her doctor had told her was fibromyalgia.  On June 8, 2009, Plaintiff's medications included Geodon (bipolar disorder), Klonopin (anxiety), Glyburide

(diabetes), Lunesta (insomnia), Neurontin (back pain), Hydrocodone (back pain), Levothyroxine (thyroid hormone), and Citalopram (depression).

Plaintiff testified that her bipolar disorder and depression resulted in irritability, mood swings, low self-esteem, and feelings of worthlessness and hopelessness. She had occasional panic attacks, particularly in groups of people, in which her hands began to sweat and her heart beat rapidly. She was nervous and paranoid. She no longer enjoyed socializing or going out in public. Plaintiff's mental health disorders were treated with medication and individual therapy.

Plaintiff testified that she could lift about two gallons of milk. She could sit for two to three hours at a time and could stand for two to three hours at a time, but did not think she could work for eight hours at a time. Because of her back pain, she now lay down about four or five hours in a day. Plaintiff frequently missed appointments because she forgot them or could not arrange transportation.

**Adult function report.** Plaintiff completed an adult function report on March 3, 2007, about a month after surgery removing her thyroid. On a typical day, Plaintiff slept in her room while the rest of the family went to work and school. Her depression and thyroid condition made her sleepy yet she was restless and experienced insomnia. When she became very nervous, she shook or rocked. Her attention and energy were low. Her adult son came in to watch her while the rest of the family was away. She was able to perform personal care but only when someone else was at home.

Because she was too nervous and shaky to do household chores, her children cleaned the house. Her boyfriend, John, took care of their finances since she forgot to pay bills on time. Her former employer had fired her for not getting along with other employees.[1]

Plaintiff did not like to go out among people where she became paranoid and confused. Sometimes she forgot where she was going or what she was doing. She had anxiety attacks. Because her mother and sister had similar mental health problems, she preferred not to see them.

///

---

[1] In her disability report, Plaintiff stated that she stopped working June 15, 2006, when her doctor took her off work due to her disability.

1    **Third-party disability report.**  On March 3, 2007, Plaintiff's live-in boyfriend, John

2  King, prepared a third-party adult function report.  King described Plaintiff's typical day as taking

3  her medications and staying in her room with the television on, although she lacked the interest to

4  actually watch the programs.  Although she had previously functioned well, Plaintiff now came

5  out only to use the bathroom or if she was forced to come out.  She was not performing personal

6  care without encouragement and help.  King and Plaintiff's adult son cared for her children and

7  pets.

8    Having dozed off while a pan was on the stove and caused a fire, Plaintiff no longer

9  cooked.  She started projects but could not finish them.  She was nervous and anxious whenever

10  she left her room and left the house only to visit the doctor.  She could no longer function socially.

11  Plaintiff had been fired from her dry cleaning job when she became moody and depressed and was

12  unable to get along with her fellow employees.

13    Although King was present and available to testify at the administrative hearing, Plaintiff's

14  attorney Jeffrey Milam elected not to present his testimony.  Instead, Milam stated:

15    I'm going to submit a brief offer of proof if you'll let me that just is–asking him
     it–they've been together for a while–or several years, and over the last year or two I
16    asked him if she had days that were really bad and she was shaky around [the]
     house, and he said, Yeah that happens and that he can't do much about it when she
17    gets like that.  That was really all I had to bring him in for.

18    AR 47.

19    **Physical and mental health progress.**  March 24, 2006 notes reported that Dr. Chase had

20  diagnosed Plaintiff with hyperthyroidism.[2]  Notes from Fresno Medical Center dated June 7, 2006,

21  reflected a diagnosis of depression, anxiety, stress, hyperlipedemia, and hyperthyroidism. Lab

22  tests administered June 2006, showed that Plaintiff's blood sample was reactive to a test for

23  Hepatitis C.  Plaintiff's blood glucose was elevated.

24  ///

25

26 ───────────────

27    [2] Hyperthyroidism is "a condition caused by excessive production of iodinated thyroid hormones and
   marked by goiter, tachycardia or atrial fibrillation, widened pulse pressure, palpitations, fatigue, nervousness and
   tremor, heat intolerance and excessive sweating, warm, smooth, moist skin, weight loss, muscular weakness, hyper
28  defecation, emotional lability, and ocular signs (stare, lid lag, photophobia, sometimes exophthalmos)."  *Dorland's
   Illustrated Medical Dictionary* at 802 (28th ed., 1994).

On July 26, 2006, Plaintiff reported that she was constantly fatigued and her bones ached. Ibuprofen did not relieve the pain, but her mother's Vicodin was effective. Fresno Medical Center notes from August 11, 2006, added a diagnosis of diabetes mellitus, type 2.

On September 13, 2006, Fresno County Mental Health (Turning Point Program) performed an initial mental health assessment of Plaintiff.[3] Plaintiff went to FCMH on her own initiative, indicating that she was experiencing "significant impairments in daily living/functioning due to: sadness and hopelessness, anger and irritability, worry and anxiety, isolation and social withdrawal behaviors, sleep disturbances, worry and anxiety, and periodic thoughts of harming others when angry." AR 225. Her hair was uncombed, and she was fidgeting and anxious. Although Plaintiff had experienced many mental health issues since her childhood and teens, in the past year she had developed a violent temper, had been accused of child abuse, and had injured herself. Frederic W. Lee, LMFT, diagnosed:

| Axis I | 296.32 | Major depressive disorder, moderate |
| | 300.00 | Anxiety Disorder |
| | 304.80 | Polysubstance abuse, in remission |
| | V62.82 | Bereavement |
| Axis II | V71.09 | None |
| Axis III | Diabetes, Hepatitis C, Hyperthroid | |
| Axis IV | Financial concerns, Family and social stressors | |
| Axis V | Current GAF = 56; Past Year unknown | |

AR 227.[4]

///

---

[3] FCMH had previously provided Plaintiff with services beginning in 1993.

[4] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR"). It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." Id. at 34. The first description in the range indicates symptom severity; the second, level of functioning. Id. at 32. In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. Id. at 33.
    GAF 56 is in the middle of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34.

1    An FCMH psychiatric assessment dated October 12, 2006, described Plaintiff as

2  hypervigilant.  Harold I. Tarpley, M.D., Plaintiff's assigned psychiatrist, diagnosed depression and

3  prescribed medication.

4

5    Reporting on an ultrasound examination on October 27, 2006, Michael Nguyen, M.D.,

6  noted thyromegaly and two nodules on Plaintiff's thyroid.  He recommended a needle biopsy,

7  which Teresa Chan, M.D., administered on November 27, 2006.  Pathologist Wei Fang reported

8  that the biopsy samples revealed only erythrocytes and inflammatory cells.[5]

9    Although Plaintiff reported good and bad days in November, she told her Turning Point

10  counselor that she had begun to again be able to prepare meals for her children.  Greeting her

11  children after school and interacting with them felt good.  She was able to walk outside and had

12  shopped for herself at Target.  Plaintiff remained afraid to ride public transportation and missed

13  appointments when family members were not free to drive her.

14    In December 2006, Dr. Tarpley changed Plaintiff's prescriptions to Ambien and Elavil.  In

15  December, Plaintiff reported feeling anxious and stressed, and questioned whether her

16  medications were working.

17    At the time of a repeat ultra sound examination on January 9, 2007, Spencer Silverbach,

18  M.D., diagnosed goiter and reported the size of both thyroid nodules had substantially increased.

19    In January 2007, Plaintiff saw her doctors frequently as her thyroid surgery, scheduled for

20  February 2007, approached.  She was experiencing fatigue, neck pain and headaches, an inability

21  to get warm, and sleeping problems caused in part by the goiter's blocking her airway when she

22  lay down.  By the end of January 2007, Plaintiff's thyroid was approximately five times normal

23  size.

24    In January, Plaintiff continued to worry that her mental health medications was not

25  working.  Late in the month, in preparation for surgery, she was required to discontinue all

26  medications prescribed for her mental health conditions.

27

28

[5]  Plaintiff told her Turning Point counselor that she had been diagnosed with thyroid cancer.

1    Christina Maser, M.D., performed a thyroidectomy on February 14, 2007.  Pathologist
2    Robert M. Futoran, M.D., performed microscopic analysis and diagnosed diffuse thyroid
3    hyperplasia consistent with Grave's disease, identified no adenomatous nodules, found no
4    malignancy, and identified no parathyroid tissue.

5    On February 19, 2007, psychiatrist Norberto M. Tuason, M.D., discontinued Ambien and
6    Elavil, and prescribed Lunesta and Lexapro. He noted that Plaintiff remained depressed following
7    her surgery and was experiencing insomnia.

8    When Plaintiff met with her Turning Point counselor on February 22, 2007, she was
9    feeling better and her incision was healing well.  Plaintiff reported that her psychiatric
10   medications seemed to be helping her.  She was experiencing forgetfulness, but her family was
11   helping her.  Plaintiff again reported forgetfulness on February 29, 2007.

12   **Psychological Residual Functional Capacity (Engeln).**  Psychologist Richard Engeln,
13   Ph.D., evaluated Plaintiff as an agency consultant on March 20, 2007.  He administered the
14   Wechsler Adult Intelligence Scale III, Wechsler Memory Scale III, Bender-Gestalt Test II, Wide
15   Range Achievement Test III, Trails A and Trails B, and mental status exam.  He relied largely on
16   Plaintiff's account of her psychological history, although he received and reviewed Turning
17   Point's October 12, 2006 psychiatric assessment and the December 5, 2006 progress note.

18   Because Plaintiff did not bring her glasses, she had visual acuity problems.  Characterizing
19   Plaintiff as exaggerating her inability, Engeln stated: "She presented with much shaking, rocking,
20   and was very histrionic; but, presentation did not appear to be credible."  AR 334.  Her Rey 15
21   memory test was positive for exaggeration.  Engeln opined that the intellectual measurements
22   understated Plaintiff's ability and reflected her attitudinal and emotional issues.  Verbal
23   intelligence scores fell within the low range of mild mental retardation, and visual intelligence
24   was in the moderate range of retardation.  Other scores were within the mid to moderate range of
25   retardation.  On the Wide Range Achievement Test, Plaintiff failed to reach the first grade level
26   on reading, spelling, or arithmetic.

27   ///

28   ///

1    Although Engeln attributed Plaintiff's limited intellectual abilities to emotional and

2  attitudinal issues, he opined that she showed no evidence of mental or emotional illness.  He

3  found her rocking, shaking, and histrionics not to be credible.[6]  Engeln summarized:

4          Because of her exaggeration, I am unable to say what her abilities actually are.  She
           appears mentally competent to manage funds.  She reports a history of past
5          substance abuse issues.  A limited conservator needs to be appointed to assist in
           money management issues.  Verbally, cognitively, and socially Ms. Cortez appears
6          capable of job adjustment in an entry-level context where instructions are simple,
           and unidimensional and normal supervision is provided [*sic*].  She would be able
7          to perform one-to-two step simple job instructions, but not able to receive complex
           or technical job instructions.  There do not appear to be any psychological
8          restrictions to job adjustment potential.

9    AR 335.

10   **Residual Functional Capacity (Ginsburg and Murillo).**  On April 17, 2007, medical

11  consultant Brian J. Ginsburg, M.D., prepared a physical residual functional capacity assessment.

12  He opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could

13  stand six hours in an eight-hour work day; could sit six hours in an eight-hour work day; and had

14  unlimited ability to push and pull.  In the accompanying case analysis, Ginsburg acknowledged

15  that both Hepatitis C and Grave's disease can cause "a great deal of fatigue."  AR 349.  He

16  predicted that the thyroid would correct itself with surgery and replacement levothyroxine.

17   In the accompanying case analysis,  Ginsburg suggested that Plaintiff's physical residual

18  functional capacity be considered to be light in consideration of the substantial fatigue that can

19  result from both Hepatitis C and a thyroidectomy.  Psychiatrist Evangeline Murillo, M.D., noted

20  that Plaintiff had stopped all medications on January 19, 2007, was scheduled for thyroid surgery

21  on February 7, 2007, and exaggerated presentation.

22   On May 1, 2007, Murillo completed the psychiatric review technique, identifying Plaintiff

23  as having an affective disorder, but indicating that the evidence was insufficient to substantiate an

24  affective disorder.  In the accompanying mental residual functional capacity assessment, Murillo

25  opined that Plaintiff had no significant limitations except that she was moderately limited in the

26

27      [6]  In response to her attorney's questioning,  Plaintiff testified that she thought that the appointment went
    OK even though she was having a bad day since she was then changing medications.  She explained that she
28  sometimes experienced shakiness when she was anxious, but testified that she tried her best on the tests she was
    given.

1    ability to understand, remember, and carry out detailed instructions.  Murillo remarked: "Can

2    sustain simple and repetitive tasks with adequate pace[,] able to interact with co-workers and

3    supervisors[,] able to adapt to work changes and relate with supervisors and others."  AR 362.

4         **Continued Medical and Psychological Treatment.**  On May 3, 2007, Plaintiff told

5    Turning Point counselor Lorena Carillo of her decreasing nervousness and anxiety.  Carillo

6    introduced relaxation and coping techniques and helped Plaintiff prepare an exercise schedule

7    consisting of gardening, watering the grass, and cleaning.  On May 10, 2007, Carillo discussed

8    with Plaintiff her recent SSI denial, providing Plaintiff with referrals to AFDC, CalWorks, food

9    stamps, and career and vocational development.  Plaintiff expressed fear of returning to work but

10   agreed to work with job options.

11        On June 18, 2007, Carrillo reported that Plaintiff fidgeted while sitting, spoke loudly as if

12   Carrillo could not hear her, stared with eyes wide open, and reported hearing voices.  Plaintiff

13   thought the voices were taking over.  Plaintiff also told Carrillo that she could not sleep and had

14   stopped driving.

15        On June 28, 2007, Plaintiff was detained by Fresno County Mental Health (PACT) and

16   hospitalized as an inpatient under a California Welfare and Institutions Code § 5150 involuntary

17   civil commitment.   During a regular appointment with Dr. Tarpley, Plaintiff disclosed a plan to

18   commit suicide by overdosing on her medications.  Plaintiff told Dr. Tarpley that her (deceased)

19   father had come to her and told her that it was time for her to go.  Simultaneously, she expressed

20   fear of sleeping in case she did not wake up.  She was hypothyroid and not fully compliant with

21   her medications, having stopped taking Lexapro and Lunesta after they appeared not to be

22   working.[7]  On intake, Plaintiff was diagnosed:

23        Axis I        311          Depressive Disorder NOS
                         300.00       Anxiety Disorder NOS
24                       304.80       Polysubstance Dependence (In Recovery)

25        Axis II       V799.9       Deferred

26

27        [7]  Hypothyroidism is "a deficiency of thyroid activity.  In adults, it is most common in women and is
     characterized by decrease in basal metabolic rate, fatigue and lethargy, sensitivity to cold, and menstrual
28   disturbances.  If untreated, it progresses to full-blown myxedema."  *Dorland's Illustrated Medical Dictionary* at 811
     (28th ed., 1994).  Operative myxedema results from removal of the thyroid gland.  *Id.* at 1096.

| Axis III | Thyroid Condition |
|---|---|
| Axis IV | Chronic mental illness, single parent, financial problems, lack of primary support system |
| Axis V | Current GAF = 20; Highest GAF past year = unknown |

AR 386.[8]

Treatment notes dated June 30, 2007, indicated that Plaintiff was severely depressed, hearing voices, and expressed suicidal ideation, that is, an intent to overdose her prescriptions. Plaintiff reported auditory and visual hallucinations of her late father, who encouraged her to discontinue her medications, kill herself, and join him.  Plaintiff had stopped taking Seroquel, explaining that she thought was responsible for the hallucinations.[9]  Plaintiff had also stopped taking Lexapro.[10]

Plaintiff was discharged from Community Medical Center on July 2, 2007.  At discharge, her thyroid levels were again above normal (hyperthyroid).  Her diagnosis on discharge was:

| Axis I | Depressive Disorder NOS |
|---|---|
| Axis II | Deferred |
| Axis III | Thyroid Condition |
| Axis IV | Recent death in family, financial problems |
| Axis V | Current GAF = 60 |

AR 386.[11]

///

---

[8]  GAF 20 is at the top of the range GAF 11-20, which indicates "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute).  DSM IV TR at 34.

[9]  Seroquel (Quetiapine) is prescribed to treat schizophrenia and may be prescribed alone or with other medications to treat bipolar disorder.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030 (July 10, 2012).

[10]  Lexapro (Escitalopram) is prescribed to treat depression and generalized anxiety disorder.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214 (July 10, 2012).

[11]  GAF 60 is at the top of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM IV TR at 34.

1    On July 4, 2007, Plaintiff told therapist Jonathan Halverstadt of her difficult prior week

2  and of being diagnosed with bipolar disorder while at CBHC.  Plaintiff reported that, although her

3  father had again appeared to her that morning and told her to die because he missed her, Plaintiff

4  was able to reply that she could not die now because her children and a coming grandchild needed

5  her.  But she also reported that she might commit suicide by driving her car into a post.

6    On July 5, 2007, Dr. Tarpley described Plaintiff as "doing badly."  AR 399.  Plaintiff

7  continued to experience insomnia, hear voices, and express fear.  She was disheveled and restless,

8  with rapid speech and labile mood.  She was not compliant with medications.

9    On July 12, 2007, Carillo observed that Plaintiff was louder than usual and was not

10  making sense.  Plaintiff told Carillo that her medications were increasing her anxiety and reported

11  that she was adjusting the medications to address her perceived moods.  Carillo warned Plaintiff

12  of the dangers of varying the prescribed dosages.  On July 19, 2007, Dr. Tarpley noted that

13  Plaintiff's mental status was back within normal limits as she began to adjust to the new

14  medication schedule.

15    On July 31, 2007, Plaintiff told Halverstadt that she was experiencing significant levels of

16  depression, anxiety, worry, sadness, irritability, anger, paranoia, and audio and visual

17  hallucinations.  Although she tried to "reality test," Plaintiff found the hallucinations, which were

18  particularly compelling in her bedroom, so distressing that she sometimes went to stay at her

19  younger brother's home.

20    In August 2007, Plaintiff was too anxious to be at home and was living with her brother.

21  On August 14, 2007, Dr. Tarpley observed that Plaintiff was agitated, with rapid speech and labile

22  mood.  She was fearful and hearing voices.

23    In September 2007, Plaintiff demonstrated oversedation and excessive isolative behavior.

24  She told Halverstadt that she felt stressed, depressed and "zoned out" ("like a zombie").  AR 593.

25  She complained to nurse Barbara Axberg that she was drowsy and too out of it to care for her

26  children.  Halverstadt observed blunted affect, depression, anxiety, worry, sadness, irritability,

27  anger, paranoia, audio and visual hallucinations, anhedonia, and suicidal thoughts and ideation.

28  ///

He referred Plaintiff to a program of educational therapy that he hoped would decrease her isolating behavior and alleviate her symptoms of psychosis, depression, and anxiety.

In October 2007, Plaintiff received frequent mental health treatment.  Troubles with her thyroid and psychiatric medications caused constant anxiety and panic.  Plaintiff reported increased anxiety, depression, worry, sadness, irritability, anger, paranoia, and audio and visual hallucinations.   She was barely sleeping.  Nonetheless, Plaintiff's mood and outlook often improved in the course of sessions with Halverstadt or a counselor.

Halverstadt conducted much of the October 16, 2007 session walking outdoors because Plaintiff panicked when she was inside the office.  He arranged for Plaintiff to see the psychiatrist two days later.  Plaintiff responded to Turning Point counselor Nikki Rojas' suggestion that she participate in group therapy with uncertainty since her anxiety increased in large groups. Ultimately, she agree to try group therapy if a counselor could accompany her.

On October 18, 2007, Plaintiff told Turning Point counselor Adrienne Lopez that she had not been taking her medications for fear that she would not wake up.  In particular, Klonopin seemed to be increasing her paranoia, which was so intense that she felt unable to drive and could not sleep at night.

**Psychological Residual Functional Capacity (Michiel).**  On November 3, 2007, psychiatrist Ekram Michiel, M.D., prepared a consultative opinion for the agency.  Dr. Michiel found Plaintiff to be a fairly good medical historian.  Based on his examination, Michiel diagnosed:

| | |
|---|---|
| Axis I | Depressive Disorder NOS |
| Axis II | Deferred |
| Axis III | History of hypothyroidism |

///

///

///

///

///

Axis IV                    Stressors: social conditions

Axis V                     Global Assessment of Functioning: 65

AR 483.[12]

Michiel opined:

Based upon the evaluation and observation throughout the interview, I believe that the claimant is able to maintain attention and concentration and to carry out one or two step simple job instructions.

The claimant is able to relate and interact with coworkers, supervisors and the general public.

The claimant is unable to carry out an extensive variety of technical and/or complex instructions.

AR 483.

**Physical Residual Functional Capacity (Stoltz and Reddy).**  On November 4, 2007, internist Steven Stoltz, M.D., prepared an internal medicine evaluation for the agency.  Plaintiff's physical condition and range of movement was consistently within normal limits, except that she was missing all of her upper teeth.  Stoltz diagnosed recent onset type II diabetes mellitus, Hepatitis C, bilateral arm pain, psychiatric, and thyroid disorder.  He summarized:

Based on my observations and objective physical examination findings, I find no objective evidence for any ongoing medical disorders that would place any limits on work-related activities.  I would pay attention to any recommendations made from her recent psychiatric evaluation.

AR 489.

In a case analysis dated January 9, 2008, agency physician Sadda V. Reddy, M.D., agreed that, in light of the consulting examination and the evidence in the record, Plaintiff demonstrated no physical functional limitations.

**Continued Medical and Psychological Treatment.**  On November 27, 2007, Plaintiff complained of problems with Klonopin, which she reported was making her restless and depressed, and keeping her from sleeping at night.

---

[12]  GAF 65 is at the middle of the range GAF 61-70, which indicates ""[s]ome mood symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM IV TR at 34.

13

1    In early December 2007, Turning Point advised Plaintiff that she would no longer be

2  treated at the Home Center, which was the location at which she had previously received

3  treatment.  Plaintiff was depressed, angry, and paranoid, indicating her unhappiness at having to

4  leave the Home Center and her unwillingness to be treated at another location called "Metro."

5    Ultimately, Plaintiff left Turning Point and began treatment with psychiatrist Latif Ziyar,

6  M.D., in December 2007.  Dr. Ziyar, who diagnosed Plaintiff with bipolar disorder and panic

7  disorder, provided medication management, supportive psychotherapy, and cognitive behavior

8  therapy.  Her handwritten notes are largely illegible, but consistently reflect Plaintiff's stress,

9  including problems with her children and the illness of her elderly mother.  Plaintiff was

10  frequently angry, irritable, or both.

11    On January 6, 2009, Dr. Ziyar requested that FCMH reauthorize services to Plaintiff for

12  her bipolar disorder and depression.  As part of the request, Dr. Ziyar reported that, for purposes

13  of child support services, Plaintiff was permanently disabled, with disability having begun on

14  December 11, 2007.

15    From January 14 to January 17, 2009, as a result of suicidal ideation, Plaintiff was

16  detained at the Behavioral Health Unit of Community Regional Medical Center pursuant to

17  California Welfare and Institutions Code § 5150.  Plaintiff acknowledged that she had a suicide

18  plan but would not disclose it.  Although Plaintiff initially appeared voluntarily, she was detained

19  as a danger to herself when she attempted to leave in the course of the initial psychiatric

20  assessment.  Plaintiff refused synthroid (thyroid medication), advising hospital staff that she had

21  stopped taking it some time ago and was fine without it.  Plaintiff complained of back pain, which

22  the hospital treated with Naproxyn.

23    Plaintiff reported much recent stress, stating her sister-in-law and nephew had died in a

24  home fire in November, her brother-in-law had recently died after being hit by a truck, her 17-

25  year-old-son had been removed from her custody, and her mother was mentally ill.  Plaintiff's

26  diagnosis at admission was:

27    Axis I              Major depressive disorder, recurrent, without psychotic features.
                          Rule out bipolar disorder, depressed episode.
28

| | |
|---|---|
| Axis II | Deferred |
| Axis III | Hepatitis C and non-insulin dependent diabetes mellitus |
| Axis IV | Severe stressors |
| Axis V | GAF = 40 |

AR 673.[13]

On discharge, Plaintiff's diagnosis was

| | |
|---|---|
| Axis I | Major depressive disorder. |
| Axis II | Deferred |
| Axis III | Hepatitis C. |
| Axis IV | Recent death in family, financial problems, recent Interferon treatment for Hepatitis C. |
| Axis V | GAF = 60 |

AR 673.[14]

Anong Y. Moua, M.D., treated Plaintiff from March through May 2009, for back pain, hypothyroidism, and type II diabetes.  Dr. Moua also initiated interferon treatment for hepatitis.

On April 21, 2009, Dr. O'Laughlin, a physiatrist who provides pain management, first saw Plaintiff for chronic pain syndrome on a referral from Dr. Dhillon.[15]  Plaintiff told Dr. O'Laughlin that her back pain dated to her school years, when she was diagnosed with scoliosis, but was aggravated by her work four years earlier for the dry cleaners and lifting crates when she packed tortillas.  Although she performed exercises, she had never recovered.  Although she had not used marijuana since she was a teenager, because marijuana relieved the pain, she wanted a medical

---

[13]  GAF 40 is at the top of the range GAF 31-40, which indicates "Some impairment in reality testing or communication (e.g., speech is sometimes illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed and avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school)."  DSM IV TR at 34.

[14]  GAF 60 is at the top of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.* at 34.

[15]  The Court was unable to identify any documents in the administrative record relating to Plaintiff's having been treated by Dr. Dhillon.

1  marijuana card.  She told O'Laughlin that she used to use Percocet, which helped her, but she did

2  not know why she stopped using it.  Norco and Vicodin also helped her.

3     Dr. O'Laughlin's examination revealed somewhat diffuse tension and tenderness in the

4  long extensor muscles in the posterolateral regions on both sides of Plaintiff's neck.  Her cervical

5  range of motion was within normal limits.  Plaintiff complained of tenderness in her lower

6  thoracic and lumbar back.  Straight leg raising was negative.[16]  Although Dr. O'Laughlin intended

7  to order MRI, he diagnosed cervical and lumbar disc degeneration and chronic pain syndrome.  He

8  prescribed MS Contin and Norco for pain.

9     When Plaintiff saw Dr. O'Laughlin on May 5, 2005, she stated that MRI would be a

10  problem since she was claustrophobic.  Dr. O'Laughlin reassured her that MRI could be

11  performed with sedation.  Plaintiff complained that MS Contin made her sleepy but did not

12  relieve her pain.  Dr. O'Laughlin described Plaintiff as "in no acute distress."  AR 652.  Her neck

13  muscles remained tender.

14     X-rays administered May 15, 2009, showed "[m]ild multilevel degenerative changes,

15  consistent with the patient's age."  AR 655.  MRI of Plaintiff's cervical spine showed satisfactory

16  alignment of vertebral bodies and posterior elements, no evidence of nerve root or spinal cord

17  compression, mild multilevel degenerative changes, and a 3 mm. disc protrusion at C6-C7, that

18  radiologist Todd Spencer, M.D., deemed insignificant, noting that the neural foramina were patent

19  at that level.  Similarly, the lumbar MRI revealed multilevel degenerative changes, satisfactory

20  alignment of vertebral bodies and posterior elements patent foramina with no evidence of nerve

21  root compression, mild spinal stenosis at L4-L5, and "the suggestion of small disc bulges or

22  protrusions," which Dr. Spencer opined were probably not significant.  AR 662-663.

23     **Psychological Residual Functional Capacity (Ziyar).**  On June 3, 2009, Dr. Ziyar

24  completed a medical report, assessment, source statement, and questionnaire using forms

25  apparently provided by Plaintiff's attorneys.  Dr. Ziyar reported that she had been treating

26

27     [16]   The straight leg raising test is administered during a physical examination to determine whether a
patient with low back pain has an underlying herniated disc.  The test is positive if the patient experiences pain down
28  the back of the leg when the leg is raised.  *Miller v. Astrue*, 2010 WL 4942814 (E.D. Cal. November 30, 2010) (No.
1:09-cv-1257-SKO).

1   Plaintiff's bipolar disorder and depression with therapy and medications since December 11,
2   2007.  She opined that both Plaintiff's response to treatment and her prognosis were fair.

3        Dr. Ziyar opined that Plaintiff had fair ability to follow work rules, relate to co-workers,
4   use judgment, function independently, and maintain attention and concentration, but poor ability
5   to deal with the public, interact with supervisors, and deal with work stress.  She had poor ability
6   to understand, remember, and carry out job instructions; fair ability to understand, remember, and
7   carry out detailed but not complex job instructions; and good ability to understand, remember and
8   carry out simple job instructions.  Plaintiff had fair ability to maintain her personal appearance,
9   but poor ability to behave in an emotionally stable manner, relate predictably in social situations,
10  and demonstrate reliability.  She had poor ability to concentrate for at least two-hour increments;
11  poor ability to withstand stress and pressures associated with full-time work.  Dr. Ziyar noted that
12  Plaintiff had a long-term diagnosis of mental illness and that her impairment was permanent.

13       **Physical Residual Functional Capacity (O'Laughlin).**  Dr. O'Laughlin completed a
14  questionnaire on June 9, 2009, less than two months after he began treating Plaintiff.

15       Dr. O'Laughlin rendered his opinion on a one-page questionnaire, apparently provided by
16  Plaintiff's attorney. Dr. O'Laughlin characterized Plaintiff's primary impairments as "lack of
17  motion of spine" and "dull pain induced mobility limitations."  AR 669.  He based his opinion on
18  cervical muscular problems and an inability to rotate her head more than sixty degrees.  In
19  O'Laughlin's opinion, Plaintiff was able to sit one hour and stand or walk one to two hours
20  without rest or support.  She could sit four hours in an eight-hour period and stand or walk two
21  hours in an eight-hour period.  Plaintiff needed to lie down or elevate her legs at least twice a day
22  for at least two hours at a time.

23       Question 1 asked the doctor whether Plaintiff's medical problems precluded her from
24  performing full time work at an exertion level including the sedentary level, "defined by Social
25  Security as lifting no more than ten pounds, sitting for 6 hours in an 8-hour work day, and
26  standing/walking for two hours in an 8-hour work day.  Dr. O'Laughlin responded, "Yes Would
27  exceed limits for 1 day."  AR 669.  Question 2 asked whether, if the answer to question 1 was no,
28  whether Plaintiff was restricted to doing no more than sedentary work.  Although Dr. O'Laughlin

1  answered "yes" to question 1, he responded that Plaintiff could perform sedentary work but that

2  more than four hours a day "at this time would be a struggle."  AR 669.

3    **Vocational expert.**  Jose Chaparro testified as vocational expert.  He stated that his

4  testimony was consistent with the DOT.  Following brief colloquy regarding Plaintiff's prior

5  employment, the ALJ directed Chaparro to assume a hypothetical individual of the same age,

6  education, and work background as the claimant with no exertional limitations, but limited to

7  simple routine tasks with only limited or occasional public contact.  Chaparro opined that such a

8  person could not perform Plaintiff's prior job as a dry cleaner but could perform her prior position

9  as a hand packager.

10    For the second hypothetical question, the ALJ directed Chaparro to assume that the

11  hypothetical individual was limited to occasional lifting fifty pounds and frequently lifting twenty-

12  five pounds; could sit, stand, and walk six hours in an eight-hour work day; could perform simple

13  routine tasks; and required limited public contact.  Chaparro opined that such a person could still

14  perform Plaintiff's prior work as a hand packager.  The hypothetical person could also work as a

15  caretaker (DOT No. 301-687-010; medium; unskilled) with 4200 jobs in California and 41,800

16  jobs nationally; industrial cleaner (DOT No. 381-687-018; medium; unskilled) with 2100 jobs in

17  California and 22,000 jobs nationally; or cook's helper (DOT No. 317-687-010; medium;

18  unskilled) with 70,000 jobs in California and 602,000 jobs nationally.

19    For the third hypothetical question, the ALJ directed Chaparro to assume that the

20  hypothetical individual was limited to occasional lifting twenty pounds and frequently lifting ten

21  pounds; could sit, stand, and walk six hours in an eight-hour work day; could perform simple

22  routine tasks; and required limited public contact.  Chaparro opined that such a person could not

23  perform any of Plaintiff's prior work.  The hypothetical person could work as a can filler and

24  closing machine tender (DOT No. 529-685-282; light; unskilled) with 3000 jobs in California and

25  24,900 jobs nationally; housekeeping cleaner (DOT No. 323-687-014; light; unskilled) with

26  24,300 jobs in California and 244,000 jobs nationally; or linking machine operator (DOT No.

27  529-685-162; light; unskilled) with 2600 jobs in California and 21,800 jobs nationally.

28  ///

1    For the fourth hypothetical question, the ALJ directed Chaparro to assume that the

2    hypothetical individuals described above would be unable to concentrate more than thirty minutes.

3    Chaparro replied that no jobs would be available for such a person.

4    **II.    Legal Standards**

5    To qualify for benefits, a claimant must establish that he or she is unable to engage in

6    substantial gainful activity because of a medically determinable physical or mental impairment

7    which has lasted or can be expected to last for a continuous period of not less than twelve months.

8    42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of

9    such severity that he or she is not only unable to do his or her previous work, but cannot,

10   considering age, education, and work experience, engage in any other substantial gainful work

11   existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

12   To encourage uniformity in decision making, the Commissioner has promulgated

13   regulations prescribing a five-step sequential process for evaluating an alleged disability.  20

14   C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following

15   questions:

16   Step one:      Is the claimant engaging in substantial gainful activity?  If so, the
                    claimant is found not disabled.  If not, proceed to step two.
17
18   Step two:      Does the claimant have a "severe" impairment?  If so, proceed to
                    step three.  If not, then a finding of not disabled is appropriate.

19   Step three:    Does the claimant's impairment or combination of impairments
                    meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P,
20                  App. 1?  If so, the claimant is automatically determined disabled.  If
                    not, proceed to step four.
21
22   Step four:     Is the claimant capable of performing his past work?  If so, the
                    claimant is not disabled.  If not, proceed to step five.

23   Step five:     Does the claimant have the residual functional capacity to perform
                    any other work?  If so, the claimant is not disabled.  If not, the
24                  claimant is disabled.

25   *Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

26   The ALJ found that Plaintiff had not engaged in substantial gainful activity since the

27   alleged onset date of June 13, 2006.  Her severe impairments were bipolar disorder, depression,

28   and mild cervical and lumbar degenerative joint disease.  None of these impairments met or

medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  Plaintiff had the residual functional ability to lift and carry 50 pounds occasionally and 25 pounds frequently; to sit, stand, and walk six hours in an eight-hour work day; and to perform simple routine tasks with limited or occasional contact with the public.  She was able to perform her past relevant work as a hand packager.  Accordingly, the ALJ concluded that Plaintiff was not disabled.

In evaluating the Commissioner's decision, the ALJ's findings of Plaintiff's lack of credibility must not be overlooked.  Noting various doctors' observations that Plaintiff was malingering, making misrepresentations, was less than fully cooperative, and put forth less than full effort during examinations, Judge Madsen concluded that Plaintiff "was seeing physicians primarily in order to generate evidence for this application and appeal, rather than in a genuine attempt to obtain relief from the allegedly disabling symptoms."  AR 18-19.  In support of her conclusion, the ALJ noted (1) numerous medication changes, ostensibly due to side effects or ineffectiveness; (2) lack of compliance with prescribed medications, suggesting that Plaintiff's symptoms may not have been as limiting as she alleged; (3) numerous cancellations and missed appointments; and (4) a global assessment of functioning that, except for her two hospitalizations, averaged approximately 60.  Accordingly, Judge Madsen found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not fully credible.  Plaintiff does not challenge the ALJ's credibility findings in this appeal.

**III.**   **Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the

1  Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

2  evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

3  *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

4  determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

5  the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

6  *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support

7  either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754 F.2d

8  1545, 1549 (9th Cir. 1985).

9  **IV.    Opinions of Treating Physicians**

10        Plaintiff contends that the ALJ erred in failing to adopt the opinions of Plaintiff's residual

11  functional capacity rendered by her treating physicians, Dr. O'Laughlin and Dr. Ziyar.  The

12  Commissioner counters that the ALJ appropriately rejected those opinions as unsupported,

13  conclusory, and usurping a decision reserved to the Commissioner.

14        Physicians render two types of opinions in disability cases: (1) medical, clinical opinions

15  regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to

16  perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound

17  by an expert medical opinion on the ultimate question of disability."  *Tomasetti v. Astrue*, 533

18  F.3d 1035, 1041 (9th Cir. 2008); S. S. R. 96-5p.  The regulations provide that medical opinions be

19  evaluated by considering (1) the examining relationship; (2) the treatment relationship, including

20  (a) the length of the treatment relationship or frequency of examination, and the (b) nature and

21  extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6)

22  other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

23        Three types of physicians may offer opinions in social security cases: "(1) those who

24  treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the

25  claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

26  (nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally

27  entitled to more weight than the opinion of a doctor who examined but did not treat the claimant,

28  and an examining physician's opinion is generally entitled to more weight than that of a non-

1  examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating

2  physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625,

3  631 (9th Cir. 2007).  A treating physician is employed to cure and has a greater opportunity to

4  know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

5  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or

6  the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

7      **A.**    **Dr. O'Laughlin**

8         The ALJ rejected Dr. O'Laughlin's assessment of Plaintiff's residual functional capacity,

9  finding the restrictions he would impose (sit for four hours, stand and walk for two hours, and

10  must lie down for four hours) "overly restrictive" and "based solely on subjective complaints."

11  AR 19.  A review of the records of Dr. O'Laughlin's treatment of Plaintiff provide substantial

12  support for the ALJ's conclusion.

13         Dr. O'Laughlin, a physiatrist who provides pain management, first saw Plaintiff on April

14  21, 2009, ostensibly as a referral from Dr. Dhillon, although the record includes no documents

15  linked to Dr. Dhillon.  Although her initial disability claim did not include back pain, Plaintiff

16  told Dr. O'Laughlin that she had suffered severe back pain since childhood and had aggravated

17  her condition through lifting on her job packing tortillas.  She claimed that exercise had not

18  resolved her back problems and that marijuana, Percocet, Norco, and Vicodin effectively treated

19  her chronic pain.  Although Dr. O'Laughlin's examination revealed muscular tension and

20  tenderness, Plaintiff's range of motion was normal and straight leg-raising was negative.  Even

21  before he sent Plaintiff for an MRI evaluation, he diagnosed her with cervical and lumbar disc

22  degeneration and chronic pain syndrome and prescribed MS Contin and Norco.

23         On May 5, 2005, Plaintiff sought to avoid MRI, claiming claustrophobia.  Dr. O'Laughlin

24  observed that Plaintiff was "in no acute distress."  The subsequent x-ray and MRI examinations

25  revealed only mild changes consistent with normal aging and some small disc bulges or

26  protrusions that the radiologist deemed insignificant.  Nonetheless, less than two months after he

27  had first seen Plaintiff and in complete contradiction of his treatment notes, Dr. O'Laughlin

28  ///

opined that Plaintiff's range of motion and mobility were limited and that her physical condition was so severe that she could not perform even sedentary work.

Although Dr. O'Laughlin may have been a treating physician, his relationship with Plaintiff was brief and superficial.  More importantly, his opinion is not supportable in light of the results of his objective examinations.  An ALJ is not required to accept the opinion of any physician, including a treating physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  The ALJ's determination to reject Dr. O'Laughlin's opinion was supported by substantial evidence.

### B.   Dr. Ziyar

Noting that Dr. Ziyar failed to address the "nature and severity of Plaintiff's impairment," the ALJ rejected Dr. Ziyar's opinion that Plaintiff was completely and permanently disabled since it usurped an issue reserved to the Commissioner.  Her determination was appropriate.  An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; Social Security Ruling 96-5p.  "Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the . . . . ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Accordingly, the ALJ was not bound by Dr. Ziyar's conclusory opinion that Plaintiff was totally disabled.

### V.   Failure to Accept King's Report

Plaintiff contends that the ALJ erred in rejecting the testimony of Plaintiff's boyfriend, John King.  Although Mr. King did not testify at the agency hearing, in March 2007, he completed a third-party adult function report.  The Commissioner responds that any error in failing to consider King's opinion is harmless since the ALJ did not have to credit testimony regarding limitations that was inconsistent with the ALJ's findings of residual functional capacity or based on Plaintiff's discredited functional complaints.

"Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account, unless he ultimately determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'" *Nguyen v. Chater*, 100 F.3d 1462, 1467

1  (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Friends and family

2  members who are in a position to observe the claimant's symptoms and daily activities are

3  competent to testify about their observations of the claimant's condition.  *Dodrill*, 12 F.3d at 918-

4  19.  An ALJ's disregard of the testimony of friends and family members violates the regulations,

5  which provide for consideration of the observations of non-medical sources regarding the effects

6  of the claimant's impairments on his ability to work.  *Id., citing* 20 C.F.R. § 404.1513(e)(2).[17]  *See*

7  *also Sprague*, 812 F.2d at 1232.  When a claimant alleges symptoms that are not supported by

8  medical evidence in the record, the agency directs the adjudicator to obtain information about

9  those symptoms from third parties likely to have such knowledge.  SSR 88-13.  The ALJ must

10  give "full consideration" to such testimony.  Id.

11        Although the ALJ erred in failing to acknowledge Mr. King's report, any error was

12  undoubtedly harmless in that King's observations were consistent with the psychological

13  symptoms that Plaintiff reported to the various treating professionals at Turning Point and later, to

14  Dr. Ziyar.  The medical notes made in the course of Plaintiff's mental health treatment

15  acknowledged Plaintiff's tendency to self-isolate, insomnia, anxiety, nervousness, forgetfulness,

16  fatigue, and mood swings.  The medical notes also document King's observation that Plaintiff's

17  physical and mental condition had deteriorated in the approximately two years prior to her

18  thyroidectomy as her physicians endeavored to diagnose the responsible illness.  Plaintiff's

19  attorney himself minimized the substantive value of King's testimony, providing an offer of proof

20  that, had King testified, he would have said that Plaintiff had good and bad days, and that on her

21  bad days, King was unable to help her.

22  **VI.**   **Step Four: Past Relevant Work**

23        At the fourth step of the disability analysis, the ALJ must determine whether the claimant

24  is capable of performing his or her past work.  If the claimant can perform past relevant work, the

25  analysis is complete, and the claimant is not disabled.  If the claimant cannot perform his or her

26  past relevant work, the analysis continues to step five, at which the ALJ must determine whether

27

28

      [17]  The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

the claimant has the residual functional capacity to perform any other work.  *See Lester*, 81 F.3d at 828 n. 5.  Plaintiff contends that the ALJ erred in including Plaintiff's work as a hand packager at Mission Tortilla as past relevant work.  Her argument presents several problems.

The first problem is factual.  In her initial application and in her hearing testimony, Plaintiff stated only that she worked for five months loading tortillas into crates, then lifting the thirty-to-forty pound crates.  AR 32-33; 175.  Nothing in the record supports Plaintiff's claim in her opening brief that she left her job loading tortillas due to back pain.  Her initial application did not claim back pain as a severe impairment.  At the administrative hearing, Plaintiff testified that she had back pain while loading tortillas but did not complain about it until later.  Indeed, for the first time in the record, four years after she left her job at the tortilla factory, Plaintiff told Dr. O'Laughlin that working at the tortilla factory aggravated back pain dated to her childhood.  AR 653.

Second, Plaintiff's argument confuses the concepts of past relevant work and substantial gainful activity.  Substantial gainful activity is analyzed at the first step of the disability analysis, when the ALJ must determine whether the claimant is performing work that is substantial and gainful.  20 C.F.R. §§ 404.1572; 416.972.  If a claimant is able to perform substantial gainful activity during a period in which he or she claims to have been disabled, he or she is not disabled.  20 C.F.R. §§ 404.1571; 416.971.

The relevant concept at step four is whether the claimant is able to perform his or her past relevant work.  A claimant who is able to return to his or her past relevant work will be found not to be disabled.  20 C.F.R. §§ 404.1520(f); 416.920(f).  A claimant who cannot return to his or her past relevant work may or may not be disabled, depending on whether he or she can perform other work.  20 C.F.R. §§ 404.1520(g); 416.920(g).

Third, Plaintiff's argument is premised on the Court's rejecting the ALJ's factual findings and instead accepting the opinions of Dr. O'Laughlin and Dr. Ziyar.  As discussed above, the ALJ's determination to reject those doctors' opinions was supported by substantial evidence.

The ALJ turned to vocational expert Jose Chaparro for his opinions regarding work that could be performed by hypothetical individuals with impairments similar to those attributed to

1  Plaintiff.  In the course of his testimony, Chaparro opined that a hypothetical individual of the

2  same age, education, and work background as the claimant with no exertional limitations, but

3  limited to simple routine tasks with only limited or occasional public contact, could not perform

4  Plaintiff's prior job as a dry cleaner but could perform her prior position as a hand packager.  That

5  testimony constitutes substantial evidence supporting the ALJ's determination at step four.

6  **VII.**   **Step Five: Plaintiff's Limitations**

7       Even if the ALJ had erred at step four in determining that Plaintiff could perform her past

8  relevant work as a hand packager, that error would have been harmless since the ALJ determined

9  at step five the Plaintiff retained the residual functional capacity to perform jobs existing in

10 substantial numbers in the economy.  Plaintiff disagrees, again arguing that because the ALJ failed

11 to accept the limitations to which Drs. O'Laughlin and Ziyar opined, the ALJ failed to carry her

12 burden at step five.  Because substantial evidence supported the ALJ's determination to reject the

13 opinions of Drs. O'Laughlin and Ziyar, as discussed above, the ALJ was not required to include

14 those rejected opinions in her determination of whether work existed that Plaintiff could perform.

15 Judge Madsen appropriately determined that Plaintiff could perform available jobs based on

16 hypothetical questions that incorporated all the limitations she found credible and supported by

17 substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005).

18 An ALJ is not required to incorporate limitations that she has rejected as unsupported or not

19 credible.

20 **VIII.**   **Conclusion and Recommendation**

21      A review of applicable law and facts indicates that the ALJ applied appropriate legal

22 standards and that substantial credible evidence supported the ALJ's determination that Plaintiff

23 was not disabled.  Accordingly, the undersigned recommends that the District Court affirm the

24 Commissioner's determination.

25      These Findings and Recommendations will be submitted to the Honorable Lawrence J.

26 O'Neill, United States District Judge, pursuant to the provisions of 28 U.S.C § 636(b)(1).  On or

27 before August 31, 2012, any party may file written objections with the Court.  The document

28 should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Plaintiff is advised that, by failing to file objections within the specified time, she may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   August 1, 2012                          /s/ Sandra M. Snyder
                                    UNITED STATES MAGISTRATE JUDGE